UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ROSILAND MORRIS, | : | Case No. 3:12-cv-282 |
| Plaintiff, | : | Judge Timothy S. Black |
| vs. | : | |
| ERIC K. SHINSEKI, Secretary of Department of Veterans Affairs, | : | |
| Defendant. | : | |

**DECISION AND ENTRY GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 19)**

This civil case is before the Court on the Motion for Summary Judgment filed by Defendant the Department of Veterans Affairs. (Doc. 19). Plaintiff filed a Memorandum in Opposition to Defendant's Motion. (Doc. 21). Defendant filed a Reply in Support of Motion for Summary Judgment. (Doc. 33). Defendant's Motion is now ripe.

**I. FACTS**

Plaintiff Rosiland Morris ("Plaintiff") is an African-American female who currently works as a Diagnostic Radiologic Technologist at the Dayton Veterans Affairs Medical Center in Dayton, Ohio (the "DVAMC"). Plaintiff received an associate's degree and registry in Radiology from Sinclair Community College in 1972. She began her employment with the DVAMC as a Diagnostic Imaging Technician on April 3, 1993.

In late 2005, the DVAMC installed a Magnetic Resonance Imaging ("MRI") scanner. In 2004, in anticipation of the scanner's arrival, Plaintiff and a co-worker

pursued MRI certification from Sinclair Community College.  As part of her MRI training, Plaintiff participated in clinical work at Grandview Medical Center.  The program required 320 hours of hands-on training and practice, and Plaintiff exceeded the hourly requirement.  Additionally, in August of 2005, Plaintiff went to Las Vegas, Nevada, for a week to attend further MRI training.  And even after she received her certificate and the MRI machine was installed, Plaintiff continued to receive on-the-job training at Grandview with the approval of her supervisors.

     Plaintiff's MRI training included instruction on safety.  A Medical Center Policy dedicated to "Magnetic Resonance Imaging (MRI) Safety" outlines safety policies and procedures expected of personnel at the DVAMC.  The policy states that, "[t]here are risks and safety concerns inherent in an MRI environment due to the generation of strong magnetic fields, and that the magnet is always on."  The responsibilities of MRI personnel include "screen[ing] all patients, non-MR staff and other individuals, prior to allowing access to Zone III" (the "control room").  The policy goes on to state: "[n]on-MR staff, and other individuals, who are granted access to Zone III (after appropriate screening) are under the direct supervision of MRI personnel."

     Plaintiff is familiar with the DVAMC's MRI policies and is required to review them each year.  Further, the policies and procedures are easily accessible to the employees.  Plaintiff also asserts that she is "very knowledgeable" about MRI safety and felt "absolutely 100%" adequately trained and aware of the dangers involved in using the MRI machine.  In fact, in describing her duties as an MRI Certified Technologist,

2

Plaintiff states on her resume: "[i]t is my sole responsibility to ensure that each patient is not in any danger when entering the MRI scanner."

Plaintiff also testified that she is competent to run the MRI machine by herself, though, generally, two MRI Techs were supposed to staff the machine as a safety precaution. Shortly after the machine was installed, Plaintiff was working in the department alone and scanning between twelve and fourteen patients during the day. Plaintiff also worked nights and weekends. For an eight-month period, Plaintiff was the only MRI technologist working at the DVAMC.

Plaintiff was involved in a patient safety issue operating the MRI machine in July 2010. After receiving an MRI operated by Plaintiff, a patient called the hospital to report a burn on his arm. Plaintiff denies any wrongdoing with regard to the incident, and the record in this case does not indicate that Plaintiff was found at fault for the burn incident.

On Friday, October 29, 2010, Plaintiff was the only MRI technologist on duty and was responsible for running all of the scans herself. Though two MRI techs were supposed to work the MRI machine for safety reasons, Plaintiff testified that she is "competent enough" to run the machine alone and she had previous experience doing so. Plaintiff's last patient was scheduled for approximately 11:00 a.m. that day. That morning, a nurse in the Intensive Care Unit ("ICU") requested an additional scan of an ICU patient. Plaintiff agreed to add the patient to her schedule after lunch. The patient was on a ventilator to supplement his breathing, and he was escorted to the MRI suite around 2:00 p.m. by an ICU nurse, Kerry Hankins, and a respiratory therapist, Patricia

Hammond. Hammond had never escorted a patient to MRI before and, at that time, respiratory therapists were not trained on MRI safety.

Plaintiff prepared for the patient by turning on the equipment, detaching the scan table to make it easier to transfer the patient, and obtaining the appropriate coils. Plaintiff also turned on the oxygen source in the wall of the MRI scanning room and attached the MRI safe leads because she knew the patient was on a ventilator. Plaintiff confirmed with the nurse that the respiratory therapist would be bringing the MRI safe ventilator. Plaintiff met Hankins and Hammond in the MRI waiting room. She observed the metal oxygen tank when the patient arrived. According to Plaintiff, if there is an individual, like Hammond, who is entering the MRI suite for the first time, it is important for them to know that no metal can enter the scanning room. Plaintiff asserted that MRI Technicians should not assume that people know the dangers of the MRI machine.

Before the patient was transported to the scanning room, Plaintiff testified that she told the respiratory therapist, "[n]o oxygen tanks, no metal, no nothing…Nothing goes beyond this area." As Plaintiff adjusted the patient at the end of the scanner so that he was laying straight, Plaintiff was "not concentrating on anybody but the patient." At some point Hammond walked out of the room. However, while Plaintiff was adjusting the patient, Hammond reentered the scan room with the ventilator stand and the attached metal oxygen tank. The MRI immediately attracted the metal oxygen tank, and it flew across the room into the bore of the MRI scanner. According to Plaintiff, the oxygen

4

tank "zoom[ed] right by [her] face." Fortunately, no one was injured in the serious incident. However, the MRI machine suffered around $70,000 worth of damage.

In direct response to the incident, Plaintiff received a memorandum from Dr. Neil Katz, Chief of Therapeutic and Diagnostic Imaging and her supervisor, changing Plaintiff's detail from MRI Technologist to General Radiology. The change in detail was made "pending further investigation" of the accident. Dr. Katz also initiated a fact-finding investigation where he interviewed the people involved in the incident. In his initial report, Dr. Katz concluded:

> It is the responsibility of the MRI technologist to maintain a safe environment for both staff and patients, and this was not done in this situation…There were clear violations of Medical Center Policy 114-10, MRI Safety, in at least two area[s]: Paragraph 5.a.(2)- MRI Level 2 personnel will screen all patients, non MRI staff and other individuals prior to allowing access to Zone III. …All staff requiring access to Zone III [the control room] and Zone IV [the scan room] must complete the Staff MRI Screening form… Paragraph 5.b. (13) All stretcher patients are checked for ferrous O2 cylinders …These are not allowed in Zone III. There were also violations of Radiology Policy 2056, MRI-NON- MRI Personnel Monitoring Patients. This policy states that when non-MRI trained personnel are to be in Zone III or Zone IV (control room and MRI Scanner room, respectively-access to Zone IV is only through Zone III), the MRI technologist is to verbally explain issues working in Zone III and Zone IV, that the magnet is always on, the risks of ferromagnetic items in Zone IV, the missile effect, etc. These are not only policies and procedures, but they are the basics of MRI safety training and good patient care.

Dr. Katz further recommended:

> The MRI technologist involved in this incident had been involved in another incident resulting in a minor burn to a patient. In both situations, there were issues of communication, and she was counseled about this after the first incident. Because of the severity

5

> of the current incident, which could have resulted in severe injury or
> death of a patient or staff person, the technologist involved
> [Plaintiff] has been removed from the MRI section. Further
> assessment will take place to determine whether permanent removal
> from the MRI section is warranted.

Following Dr. Katz's initial report, the record is unclear as to the next investigatory and disciplinary steps taken in regards to the October 29, 2010 incident until late 2011.

On March 10, 2011, the MRI Department staff was invited to a "presentation concerning software upgrades for the MRI scanner (the 'software meeting')." The software meeting was for MRI Technologists, and at that time Plaintiff was detailed in General Diagnostic Radiology. Plaintiff was not invited to the meeting because she was not an MRI technologist. In fact, Plaintiff admitted that "there would be no reason for a diagnostic to be there for [software] applications."

On April 12, 2011, Plaintiff sought Equal Employment Opportunity ("EEO") counseling as a result of her change in detail and denial of attendance at the software meeting. Plaintiff then filed a formal complaint with the Equal Employment Opportunity Commission on September 15, 2011. The two timely and proper claims at issue were: (1) whether Plaintiff was discriminated against when she was not invited to the March 10, 2010 software meeting; and (2) whether Plaintiff was discriminated against when her request to be reinstated as an MRI technologist was not granted.

By letter dated November 4, 2011, Ms. Morris requested that Dr. Katz return her to her MRI position no later than November 16, 2011. Thereafter, by letter dated November 22, 2011, Dr. Katz formally requested disciplinary action be taken against

Plaintiff as a result of the October 29, 2011 incident. On February 6, 2012, Dr. Katz sent a letter to Plaintiff formally notifying her of her proposed demotion from Diagnostic Radiologic Technologist, GS-647-9 (MRI Section) to Diagnostic Radiologic Technologist, GS-647-8 (General Radiology) based on a charge of Careless Workmanship in violation of Medical Center Policy 114-10.

The Medical Center Policy provides a Range of Penalties for Stated Offenses. The Range of Penalties for State Offenses states that admonishment and reprimand is the appropriate penalty for a first offense of "[c]areless or negligent workmanship resulting in waste or delay." When the nature of the offense is "[e]ndangering the safety of or causing injury to anyone on VA premises through carelessness or negligence," the minimum penalty is admonishment and the maximum penalty is removal.

On June 27, 2012, Plaintiff was issued a Final Agency Decision finding non-discrimination on both claims asserted in her September 15, 2011 EEOC complaint. Thereafter, Plaintiff filed an EEO Complaint on August 8, 2012 alleging that her demotion was in reprisal for prior EEO activity. On August 21, 2012, Plaintiff filed this case alleging that the she was blamed for the October 29, 2010 incident and that her subsequent demotion was motivated by her race and was in retaliation for engaging in EEOC activity. Plaintiff alleges she was denied a technician training opportunity on the basis of her race. Defendant now moves for summary judgment on Plaintiff's claims.

## II.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).  "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment  -  rather, all facts must be viewed in the light most favorable to the non-moving party." *Id*.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Technologies, Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted).  Instead, the party opposing summary judgment "must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id*. (citation omitted).  In fact, Fed. R. Civ. P. 56(c) states that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the material cited do not establish the

8

absence . . . of a genuine dispute[.]" Where "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

### III. ANALYSIS

Defendant argues that "there is no genuine dispute as to any material fact regarding Plaintiff's claims that she was discriminated and retaliated against based on her race[.]" (Doc. 19, PAGEID 109). In response, Plaintiff argues that she can demonstrate race discrimination using a mixed-motive analysis and argues that genuine issues of material fact remain with regard to her discrimination and retaliation claims.

#### A. Prima Facie Case of Race Discrimination

Defendant first addresses the existence of a *prima facie* case of race discrimination. Noting that Plaintiff presents no direct evidence of discrimination in this case, Defendant analyzes Plaintiff's race discrimination claim under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, Plaintiff bears the initial "burden of establishing a *prima facie* case of race discrimination[.]" *Carson v. Patterson Companies, Inc.*, 423 F. App'x 510, 513 (6th Cir. 2011).

To establish a *prima facie* case of race discrimination, Plaintiff must show that: "(1) [s]he is a member of a protected class; (2) he was qualified for his job; (3) [s]he suffered an adverse employment decision; and (4) [s]he was replaced by a person outside the protected class or treated differently than similarly situated non-protected

employees." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citations omitted). Here, Defendant argues that Plaintiff was no longer qualified for the MRI Technologist position and fails to identify a similarly situated employee treated more favorably.

In arguing that Plaintiff cannot satisfy her burden of showing that she was qualified for the MRI Technologist position, Defendant focuses on the October 29, 2010 incident and argues that Plaintiff's deficient performance in that regard renders her no longer qualified. However, "[a]t the prima facie stage, a court should focus on a Plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job[,]" *i.e.*, "Plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (citations omitted). Focusing solely on Plaintiff's education, extensive training for the MRI Technologist position, and years of experience as an MRI Technologist with Defendant, the Court concludes that, at the least, a genuine issue of material fact remains on the issue of whether Plaintiff was qualified for the position.

Next, Defendant argues that Plaintiff cannot point to any similarly situated employee treated more favorably than her.[1] While Plaintiff does not identify a specific

---

[1] Individuals are considered "similarly situated" for purposes of establishing a *prima facie* case of discrimination where they "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones v. Potter*, 488 F.3d 397, 405 (6th Cir. 2007); *see also Kendrick v. Walgreen Co.*, No. 3:11-cv-404, 2012 WL 5845016, *5 (S.D. Ohio Nov. 19, 2012); *Reardon v. Forest Pharm., Inc.*, No. 3:11-cv-274, 2012 WL 5378715, *4 (S.D. Ohio Oct. 32, 2012).

employee she contends represents a "similarly situated" employee, she instead presents evidence that she was replaced by someone outside the protected class, *i.e.*, Doug Milby, a Caucasian co-worker.[2] (Doc. 32, PAGEID 1160). Defendant has not addressed Plaintiff's contention that she was replaced by someone outside the protected class, and based on Plaintiff's testimony in this regard, the Court concludes that, at the least, a genuine issue of material fact exists as to whether Plaintiff demonstrates the fourth element of a *prima facie* case of discrimination.

Accordingly, based on all of the foregoing, Plaintiff demonstrates a *prima facie* case of race discrimination for purposes of summary judgment.

### B. Prima Facie Case of Retaliation

Plaintiff also asserts a retaliation claim in which she alleges that her demotion arising from the MRI incident on October 29, 2010 was in retaliation for filing an EEOC complaint on or about September 15, 2011. Pursuant to 42 U.S.C. § 2000e-3(a):

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

A *prima facie* case of retaliation requires that Plaintiff prove:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against Plaintiff, or Plaintiff was

---

[2] According to Plaintiff, she filed an EEO complaint against Milby in the early 2000s after Milby made a racist remark in her presence, including use of the "N" word. (Doc. 32). Milby was later removed from the DVAMC as a result of Plaintiff's complaints and other unknown misconduct. (*Id.*)

>subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cnty Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (citation omitted). Here, Defendant challenges the existence of the second and fourth elements of a *prima facie* case of retaliation, *i.e.*, knowledge of Plaintiff's protected activity and a causal connection.

### 1. Causal Connection

The Court first addresses whether Plaintiff can demonstrate a causal connection between her filing of an EEOC charge and the adverse employment action. "In order to show a causal connection, a Plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had Plaintiff not filed a discrimination action." *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)).

Plaintiff seeks to demonstrate a causal connection by pointing to temporal proximity. Generally "[t]emporal proximity alone cannot establish a causal connection." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) (citation omitted). At best, "'extremely close temporal proximity could permit an inference of retaliatory motive, but…often evidence in addition to temporal proximity is required to permit the inference.'" *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010) (citation omitted).

12

The evidence demonstrates that Plaintiff filed an EEOC complaint on September 15, 2011, alleging a denial of a training opportunity, denial of promotional opportunities, denial of reassignment to her previous position and being detailed without just cause. (Doc. 19-14, PAGEID 230-231).  The record also demonstrates that, just over two months after Plaintiff filed her EEOC complaint, Dr. Katz submitted a request for disciplinary action against Plaintiff on November 22, 2011.  In addition to this temporal proximity, Plaintiff points to the fact that the formal request for disciplinary action against Plaintiff occurred over a year after the MRI incident actually took place, a lengthy delay that is not typical in disciplinary cases at the VA.  (Doc. 23, PAGEID 461).  Defendant presents no clear explanation concerning the delay between the October 29, 2010 incident and the November 22, 2011 formal request for discipline.[3]

Based upon temporal proximity and the delay in the submission of the formal request for discipline, the Court concludes that a genuine issue of material fact exists concerning the casual connection element.

### 2. Knowledge of Protected Activity

With regard to knowledge element, again, the evidence demonstrates that Plaintiff filed an EEOC complaint on September 15, 2011.  (Doc. 19-14, PAGEID 230-231).  The evidence is not entirely clear regarding the date upon which Dr. Katz learned of

---

[3] There is some suggestion in the record that the investigation and disciplinary proceedings were, perhaps, delayed after allegations of workplace violence were submitted against Plaintiff.  Discipline on such allegations was not ultimately pursued.

13

Plaintiff's activity. Instead, the record contains only a statement from Dr. Katz that he learned of Plaintiff's EEOC complaint only "a few weeks" before January 12, 2012.

As set forth above, Dr. Katz submitted a request for disciplinary action against Plaintiff on November 22, 2011. While reasonable persons would conclude that November 22, 2011 is more than "a few weeks" before January 12, 2012, perhaps other reasonable persons would disagree. Based on the lack of clarity in the record as to whether Dr. Katz knew of Plaintiff's EEOC activity before submitting the November 22, 2011 request for disciplinary action, the Court finds that a genuine issue of material fact remains regarding the knowledge element of a *prima facie* case of retaliation.

Based on all of the foregoing, Plaintiff demonstrates a *prima facie* case of retaliation for purposes of summary judgment.

### C. Pretext

Because Plaintiff has demonstrated a *prima facie* case of race discrimination and retaliation, the burden shifts to Defendant, who, without dispute, articulates a legitimate, nondiscriminatory reason for Plaintiff's demotion, *i.e.*, her involvement in the October 29, 2011 incident. *See Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 521 (6th Cir. 2002) (stating that "[i]f the plaintiff demonstrates a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions") (citation omitted). Thus, "the burden of production returns to Plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination." *Nicholson v. City of Clarksville*, 530 F. App'x 434,

446 (6th Cir. 2013) (citation omitted).

"To establish pretext, a Plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569-70 (6th Cir. 2009) (citation omitted). To meet this burden, a plaintiff must present "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Id*. (citations omitted). "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993); *see also Simpson*, 359 F. App'x at 570; *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530-31 (6th Cir. 2012) (stating that, to establish pretext, "the employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action").

Plaintiff's only legitimate argument regarding pretext is the contention that the ultimate disciplinary charge asserted against Plaintiff, *i.e.*, "Careless Workmanship" (Doc. 19-11, PAGEID 217), was insufficient to support her demotion. Plaintiff argues that, according to the VA's "Range of Penalties for Stated Offenses," the maximum discipline for a first offense of "Careless Workmanship" is a simple reprimand. (Doc. 19-12, PAGEID 220). Anita Carmichael, the employee and labor relations specialist who actually drafted the demotion letter (Doc. 23, PAGEID 460-461, 490-491),

15

confirmed that Plaintiff was specifically charged with "careless or negligent workmanship resulting in waste or delay[,]" and that the guideline for punishment calls for admonishment or reprimand for a first time offense. (Doc. 23, PAGEID 486).

The Court acknowledges that Glenn Costie, the CEO and Medical Center Director for the Dayton VA Medical Center since December 2011, confirmed Plaintiff's assertion that Plaintiff's "demotion…exceeds the range of penalties for careless workmanship on the Range of Penalties for Stated Offenses for a first offense" and that he simply relied on the recommended discipline set forth by human resources. (Doc. 25, PAGEID 655-56). Anita Carmichael testified that the range of penalties was correctly applied to Plaintiff. (Doc. 23, PAGEID 491-492). In explaining the reasonableness of Plaintiff's demotion, Carmichael pointed to the fact that the MRI incident "occurred with a patient that could have resulted in the death of the patient and/or Miss Morris." (Doc. 23, PAGEID 494).

The Court questions whether any reasonable fact finder could conclude that the circumstances regarding the MRI incident were insufficient to explain Plaintiff's demotion. Certainly, the "Range of Penalties for State Offenses" does state that admonishment and reprimand is the appropriate penalty for a first offense of "[c]areless or negligent workmanship resulting in waste or delay." (Doc. 19-3, PAGEID 179). However, the "Range of Penalties for State Offenses" also specifies the offense of "[e]ndangering the safety of or causing injury to anyone on VA premises through *carelessness or negligence*[,]" which is punishable by discipline up to and including

16

"[r]emoval[.]" (*Id.*) (emphasis added).

The alleged offense in this case falls within the category of carelessness or negligence that endangers the safety of persons. In fact, the notice of proposed demotion clearly states in the specification of offense that Plaintiff failed in her duty to "maintain a safe environment for both staff and patients" (Doc. 19-11, PAGEID 217), an offense that, in the Court's opinion, certainly endangers "the safety of …anyone on VA premises[.]" (Doc. 19-12, PAGEID 220).

Plaintiff herself confirmed the fact that, as an MRI Tech, "it is [her] sole responsibility to ensure that each patient is not in danger when entering the MRI scanner." (Doc. 19-4, PAGEID 187). Further, no fact finder could reasonably disagree that an oxygen cylinder propelling through the air and into an occupied MRI bore poses the risk of death to those in the area, or at the least, the threat of serious physical injury to those persons. Plaintiff herself testified that "the oxygen tank "zoom[ed] right by [her] face." (Doc. 19-2, PAGEID 161).

Accordingly, while the technical offense Plaintiff was charged with does not recommend demotion as a penalty, the Court concludes that any inference of pretext arising from an above-guideline penalty, at the most, creates a very weak issue of fact insufficient to reasonably doubt the legitimate, non-discriminatory reason offered by Defendant for Plaintiff's demotion. *See Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 504 (6th Cir. 2007) (stating that "summary judgment is appropriate…if the plaintiff 'only created a weak issue of fact as to whether the defendant's reason was

17

untrue' and there is ample evidence to support the employer's position") (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) (stating that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"); *see also Chen v. Dow Chemical Co.*, 580 F.3d 394 (6th Cir. 2009) (stating that "summary judgment [in favor of the employer] is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation").

Accordingly, having concluded that Plaintiff presents, at most, a very weak issue of fact regarding pretext, and the record otherwise presents absolutely no discriminatory animus toward Plaintiff, summary judgment in favor of Defendant on Plaintiff's race discrimination and retaliation claims is proper as a matter of law.

### D. Mixed-Motive

Finally, Plaintiff asserts that race was a least a motivating factor behind Plaintiff's demotion and was a motivating factor behind her exclusion from the MRI software training. In response, Defendant argues that there are no facts in the record upon which a reasonable fact-finder could conclude that race was a factor in any adverse employment

action.[4]

"[T]he ultimate question at summary judgment on a mixed-motive case is whether Plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that a protected characteristic was a motivating factor in the defendant's adverse employment action against Plaintiff." *Williams v. Zurz*, 503 F. App'x 367, 375-76 (6th Cir. 2012) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006). Here, Plaintiff asserts that "the real reason Dr. Katz removed Ms. Morris from the MRI department following the accident is [because] Ken Balcom [Caucasian] wanted his friend Doug [Milby] [Caucasian] to take Ms. Morris' position in MRI." (Doc. 21, PAGEID 248).

Even assuming Plaintiff's contention is correct, the mere fact that someone is promoted based upon a friendship is not evidence of race discrimination. *See Pope v. City of Cleveland*, 22 F. App'x 474, 476 (6h Cir. 2001) (stating that discrimination on the basis of race could not be shown by "the fact that [decision-maker] and [successful job candidate] were friends"); *see also Caldwell v. State of Washington*, 278 F. App'x 773, 776 (9th Cir. 2008) (affirming summary judgment on race discrimination claim where "the evidence suggests only that the stated reasons for failing to promote [plaintiff] were a pretext for offering the position to a personal friend of [supervisor], not that they were a

---

[4] Defendant also argues that Plaintiff should be barred from asserting a mixed-motive argument because her Complaint and Amended Complaint present only single motive claims. Contrary to Defendant's assertion, Plaintiff did set forth allegations in her Amended Complaint that "racial animosity" "motivated" adverse employment actions. (Doc. 11, PAGEID 70, 73). Accordingly, Defendant's contention in this regard is not well-taken and the Court will address the merits of Plaintiff's mixed-motive claim.

19

pretext for racial discrimination"); *Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 733 (7th Cir. 2002) (stating that "[w]hether the employer grants employment perks to an employee because she is a protegé, an old friend, a close relative or a love interest, that special treatment is permissible as long as it is not based on an impermissible classification").

At most, Plaintiff's argument regarding her demotion is based upon a scheme to promote Milby based on friendship rather than a scheme to demote Plaintiff on the basis of her race. Plaintiff points to no evidence upon which any reasonable fact finder could conclude that anyone, including Dr. Katz, harbored any racial animus toward Plaintiff. Plaintiff also presents no evidence upon which any reasonable fact-finder could conclude that her race played any part in being denied a training opportunity. Accordingly, summary judgment is proper in favor of Defendant on Plaintiff's mixed-motive discrimination claims.

## V. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED**. The Clerk shall enter judgment accordingly and this case shall be terminated on the docket of this Court.

**IT IS SO ORDERED.**

Date: May 1, 2014　　　　　　　　　　　　*s/ Timothy S. Black*
　　　　　　　　　　　　　　　　　　　　Timothy S. Black
　　　　　　　　　　　　　　　　　　　　United States District Judge